Mr. How is it pronounced? Hockman? Yes. Perfect. Good morning. You may proceed. Good morning. Thank you, Your Honors. May it please the Court, Rob Hockman on behalf of Rusty Bucklew. At the outset, I just want to say I don't plan to address the preliminary matters this morning about the allegations of complaint or limitation or preclusion issues. We think they've been adequately handled in the briefs, and I'm happy to answer any questions you have, of course, about those either now or later, but I'll proceed directly to the merits. I'm going to begin with a summary of the evidence we've already produced that warrants a trial in Mr. Bucklew's Eighth Amendment challenge. On the preclusion, I have one thing that I would see if you'd confirm. The Zink case is now completely final for claim preclusion purposes. That's right. Of course, the State argued and the District Court did not decide that it would preclude the entire case. It seems to me what it would clearly preclude is any facial attack, any argument that amounts to a facial attack. We are not bringing a facial claim, a facial challenge.  To the extent you make arguments that are facial, since your expert, he is so strongly of the opinion that, of course, it's a non-legal opinion, that this is facially bad. To the extent you are simply parroting his arguments, you cannot accept them. Here's what I would say about that. Our expert clearly thinks that there are serious problems with lethal injection protocols across the board. Mr. Bucklew's claim that we bring to you today is not that. Okay. That is not his claim. His claim has to do with looking at the very specific nature of his rare and unique condition and trying to understand what's going to happen when an otherwise entirely permissible, under this Court's decision, an otherwise entirely permissible lethal injection protocol that could be used against anyone else who doesn't have this rare procedure will play out. That's his claim. And so that's why we think there's no issue preclusion here. I know that's the claim, but we're going to hold you to that in the argument. Understood. And I certainly want you to call attention. If I cross that threshold. As a panel, we would have to. Call it out. Call it out, and I'll try and explain, because if I cross that threshold, I've probably made a mistake. And I don't want to make a mistake here. So we'll go through the merits, arguments of why we think we're entitled to the trial. While I go through that, there are likely to be some of the issues related to discovery that will come up. I want to make sure, though, to leave some time to address the discovery issue as well, because I really think it's fundamental here. Whether we are entitled to a trial based on the evidence we have put in or not, this Court, I feel very strongly, should reach the discovery issues, because it will go to the question of what happens at that trial. We are entitled to not only make the claim that we've made, but to make the strongest possible claim we can. And that claim concerns the degree and magnitude of the risks that Mr. Bucklew is facing. And we simply cannot fully understand the full extent of those risks if we were denied discovery into... The problem is when the discovery goes to issues that would only relate to isolated mishap. Understood. And it's not simply about making mistakes. Because what we're interested in here, among other things, but what we're interested in here is how... The testimony is clear that M2 and M3 have an extraordinary amount of discretion in the execution chamber to make decisions. Those decisions are going to be brought up based in part on Mr. Bucklew's... I'm going to spend a lot of time on this, though. Based in part... Well, let me just complete this, then. Based in part on Mr. Bucklew's condition, what his rare and unique condition presents. And we know that they don't know, or at least we have no reason to believe, that they understand anything about Mr. Bucklew's condition, much less the really critical and especially rare features of his condition. That matters. It's not just about mistake. It's about not being able to address the concerns that are going to arise, either as a matter of training experience or as a matter of understanding the nature of Mr. Bucklew's condition. But let me turn to the merits. There's ample evidence that lethal injection will very likely involve excessive pain and suffering in Mr. Bucklew's case here. Let's start at the beginning. The beginning is when the execution procedure begins. They're going to try and obtain venous access. That's how a lethal injection procedure is underdone, and both experts agree. It's very likely that just won't work. It doesn't mean they won't try, and, in fact, they may try many times. I understand you to be arguing that there's a significant risk of pain just because they're going to have to do the central venous cut-down procedure. Is that not one of your arguments? I thought your argument was just that because Bucklew lies flat, he won't be able to breathe once he becomes in this twilight zone. So we're going to talk about lying flat in particular, but this is— Are you arguing that the cut-down procedure is superior? Well, we absolutely do argue that the cut-down procedure is both substandard and, obviously, quite painful. You just did that in the brief. Why didn't you find out whether they're going to do it or not? Well, we were denied discovery into M2 and M3, Your Honor. I mean, that goes directly to the discovery. Here's what we know about that. It was done in the past. That might be follow-on discovery, but where's the interrogatory request? We were not allowed to ask anything about M2 and M3's decisions. We were not given any discovery access to them at all. Give me the citation to the order that precluded it. Precluded an interrogatory? Yeah. I'm going to have to get that from counsel. I'll bring it up on rebuttal. I think there was massive disregard of Part 4 of our in-bank opinion on remand, frankly. By which you mean? By both sides. Well, one side wanting just to stretch it out as long as possible and the other side wanting to stonewall, and neither party coming to grips with what real trial lawyers would do with an as-applied issue. That's my view of the record. I haven't studied it thoroughly yet. Understood, Your Honor. What we know is that when Venus Access is unobtainable, has been unobtainable in the past through peripheral veins, the ones that we're all familiar with, elbows and arms, M-3 has used a cut-down procedure. That's been done. So this is a new argument. Judge Phillips didn't rely on this, as I understand it, on Step 1, risk of harm, risk of pain. I don't think it's a new argument, Your Honor. It's in our papers. Did Judge Phillips rely on it? Judge Phillips wrote a fairly brief opinion that did not address the full range of the risks that we have asserted and have been asserting in this litigation that we put in in opposition. Are you defending the risk of pain that she identified? Are you defending? So we do think the comparison is going to be the full risk of range of suffering, needless suffering, frankly, that Mr. Buckley was going to face, not just from multiple efforts to access peripheral veins, from the cut-down, from being forced to lay flat either during the cut-down or throughout the entire procedure, which there's every reason to believe is going to happen. It's the accumulated risk that he faces, many of which simply vanish, simply vanish entirely in a lethal gas procedure because nobody's trying to gain venous access at all. So that's why I was going to go through, Judge Colleton, the full range of what he's facing, of what we're looking at, because it's not just that he's going to be forced to lay flat and his tumor blocks his airway. There's a hemorrhage risk. And, again, we've detailed this both before the district court in our opposition to summary judgment and here on appeal, and this is in the appendix and the supplemental report of Dr. Ziv at his page, roughly pages 404 to 413 of our appendix. And if you look there, what you see, among other things, is that someone who's in Mr. Buckley's condition is experiencing increased blood pressure  and certainly increased stress from carving into the leg with a substandard cut-down procedure that neither Dr. Antognini nor Dr. Zivit think should be done, but M3 nonetheless has done in the past under similar circumstances. And all of that stress leads to both increased blood pressure and increased breathing. And increased blood pressure, Dr. Zivit explains, on sensitive tumors like Mr. Buckley's leads to bleeding. And he's bleeding out of his tumor not just on his face but in his throat. And he's starting to choke and gag on his own blood all the while, even before he's unconscious, even before he's unconscious from the pentobarbital, because the pentobarbital has not even been introduced yet. It's just while they're trying to introduce this that he's struggling to gag and breathe, struggling with the tumor position in his throat. Why has that not happened with the MRI on 6 or 7? Because the degree of stress and circumstances that he faces during an execution is nothing like an MRI procedure, and it's nothing like sleeping. It's the opposite. Both of those procedures... That sounds like an argument that he can't be executed, because it's stressful. He can be executed by lethal gas. No, because it's stressful to have somebody come in and say, we're about to execute you, and he's going to start to have an increased blood pressure. Well, that just turns... And he's going to bleed in his throat, and he won't be able to breathe. There's a huge difference, a huge difference between many, many minutes. Just think about how long. You don't know about the timing. Your record on the timing is terrible. Comparative timing is terrible. Well, there's two different kinds of timing, Your Honor. First, there's the timing before he's unconscious. That's the timing when they're trying to gain venous access, when they're pricking his body, when they're carving into his leg during the cut-down procedure. That timing is substantial. I mean, we're talking... Just think about how long it takes to make, as Dr. Antognini suggested, 8 to 10 efforts to gain venous access before they even turn to the femoral vein. So he's struggling through increased stress on each subsequent attempt, which is harder and harder to succeed. He's struggling through that for however many minutes it is. In the confidential appendix, we've indicated how long it is, and you can find it there. But it's going to be a substantial period of time. The dispute, the factual dispute, Judge Loken concerns, once he's unconscious, and once he's unconscious, Dr. Zivit has explained, and this, again, is in that supplemental report. It's our appendix 40506 and 412. And he says it's several minutes. And I understand that the defendants take issue with that. They think, oh, well, look at this horse study that Dr. Zivit pointed to. But Dr. Zivit made clear in his deposition that the horse study was not the basis of his conclusion that it would be several minutes of experiencing suffocation. He simply pointed the horse study to show that Dr. Antognini's estimate of 20 to 30 seconds is surely wrong. It's surely wrong. Are you saying that with the gas procedure, there's no severe risk, serious risk of severe pain because the stress will not be enough to cause the blood pressure to go up to cause the bleeding in the throat? Is that right? Let's talk about the gas procedure, right? No, let's just answer that. Yeah, absolutely. So here's the gas procedure, right? They're breathing. That's it. What about the stress and the blood pressure? Of course there's stress in an execution procedure. But for how long are you forced to endure stress and bleeding and struggling to gag? And that's the key thing. Nobody's spending an extended period of time trying to gain venous access. All of that time of struggling to gag on your own blood disappears under a lethal gas procedure. That's all the pre-unconscious state. That's all gone. So is that a severe risk of pain? I think that is a substantial, it's certainly part of the equation. In the gas procedure, is there, they're sure very likely to suffer severe pain or not? I think in the gas procedure, it's very likely to be a substantially reduced risk of pain. That's our point. Our point is you're comparing. Look, this court has imposed upon us the burden of coming up with an alternative procedure that satisfies the Glossop standard. That standard is not find something that we think is some kind of platonic ideal of an execution. It's find something that we think substantially, and this clearly substantially reduces the risk by both wiping out all that pre-unconscious state struggling, or at least substantially wiping it out because he's going to be breathing for some period of time. The problem is that the obvious alternative in an as-applied situation triggered by a specific medical condition is do it this way but a little differently. Your expert witness and your litigation position is no, there is no way to do lethal injection, period. You are forced to come up with a speculative gas alternative as to which none of the experts can pin down. But that's not the fault of the courts. With due respect, Your Honor, the law requires us to do two things. One, show that the lethal injection protocol they are proposing to use creates a substantial risk of excessive pain. It's very likely that Mr. Buckley will experience excruciating pain. We've done that. We've created a sufficient factual basis to conclude that's true. And then we have to propose, and then, well, we maintain... You haven't got a decision by anybody. We maintain the position that we have a sufficient factual basis to have a trial on that. That's what this appeal is. There comes a legal question I was going to ask you. My research indicates pretty strongly that both prongs of the Bayes-Glossop test, the ultimate question is one of law. Do you agree? I mean, I suppose in an ultimate, ultimate sense, yes. But it's application of fact to law, and there are factual disputes in this case. So what you're applying to the law... A material fact dispute in this situation, then, is one that would affect the district court as fact finder in making a conclusion of law. We are not talking about your typical jury rule. It's definitely not a jury case. I understand that. So this needs a trial argument. I all mean a bench trial because the judge's determination of an issue of law is in doubt. So if 20 or 30 or 52 or 240 seconds do not ultimately affect the question of law under the first prong, or by comparison to guess, the second prong, then this is not an improper grant of summary judgment. But we do know that this judge, first of all, nowhere suggests that several minutes of experiencing suffocation, slow sense of suffocation from choking on your own blood or having your uvula, swollen uvula, block your airway or both. There's no indication in that ruling that she thinks that would be okay under the first prong of Glossop. It's our decision now because once you concede it's a question of law. Well, I think this court would have the opportunity to review that. But there would have to be a finding for this court to review. No, no. You don't make findings of law. You make conclusions of law. Well, okay. At the end of the day, it's absolutely true that we maintain that from the unconscious state, several minutes of experiencing suffocation, slow suffocation while the pentobarbital has you unconscious. Is that a possibility? Would be. Is that a possibility? And it's very likely, Your Honor. First possibility or certainty? It's very likely, and that's the Glossop standard. The whole thing is a point on a continuum from absolutely no risk of harm to substantial and somewhere in between. And that's a value. Well, I won't call it a value judgment. That's a... It's a prediction. Judge Wilkins says that's a judicial determination as a matter of law that somewhere between those extremes is probably constitutional. Well, what we know from Glossop is that once you pass whatever is called the very likely standard, very likely to happen level, that's Glossop's standard. And Glossop says if it's very likely that it's... What's very likely to happen is meets the threshold for excessive pain or needless suffering, then you have an Eighth Amendment violation. Now, suppose you got the hearing or trial that you want, and Judge Phillips says, well, I credit Antognini and over-Zivit, and I think it's going to be the shorter period that Antognini says. Now, what's your position? We can't come up on an abusive discretion standard and tell this court that we think that was wrong. I mean, that's what would happen. But if she found that as a factual matter, would you agree that that eliminates prong one? Fact-finders are permitted. I'm not going to stand here and tell you fact-finders can't make factual determinations of disputed issues of fact. No, that's not my question. I'm saying, suppose she makes that factual finding, what's the legal conclusion that follows from it? That there's no... Pain is not sure or very likely because it's short. She'd have to also take into consideration the full range of pre-unconscious state. Because, remember, there's no dispute about that pre-unconscious state. I'm just talking about... Just the unconscious state. If she concluded that, you know, you're talking about 20 to 30 seconds and then you're in sensate to pain, I don't think we'd have a claim at this point. Right. Your claim depends on her saying I credit Zivit over Antognini, and that's going to be the several minutes. Certainly a big part, although not exclusively, because it's all cumulative, but a big part... On the breathing part, that's the key factual decision. On the post, what I would call the post-unconscious state part. Post-unconscious state breathing. She didn't rely at all on the pre-unconscious state. That's right. But you want to say also that the stress level from the administration of the... The effort to gain venous access. The effort to gain venous access is going to cost... And what's the evidence on that? Does Zivit say that this is going to cause blood pressure to go up and he's going to suffocate? Absolutely. That's Zivit as well. So all of that is cumulative. All of that plays a role in the first side of what you're comparing lethal gas to. I want to return, Judge Loken, to your point about how normally you might just tweak the process this way or that. That might be true. Like Nelson. Understood. That might be true in some cases. But an as-applied challenge, you craft your alternative to the circumstances. And that's what we've done. Suppose the state did on a trial what they didn't do, apparently, for some reason, send a guy in there and say, it's obvious we need to sit the guy up. So we're going to have him sit up. And that's going to eliminate the real problem. First of all, we'd welcome the opportunity to talk to M3. No, no, they don't have to send him. They send Dormier or his successor in there to say we're going to order that they sit him up. If they want to change their testimony. You want to get to the people, the executioners. Counsel, why don't you let us finish our questions? Sorry, with a pause. Maybe they do it differently in Chicago. Presumably they do. Well, it's an important case. I understand the intensity of the issues. Thank you, Judge Collin. But anyway, my question is, if they put on evidence like that, that would change the situation, wouldn't it? Because we didn't have that evidence in the . . . It would change the situation some. But I don't think, at the end of the day, laying flat isn't the solution. Sitting upright isn't the solution. Because at the end of the day, the testimony, and this again is in Zivit's supplemental report, is that when he sleeps, he struggles. He often wakes up anyway because he's still struggling to breathe. He's not only upright. He's positioned a little bit on the right. And he's ultimately managing his airway. Often waking up or positioning himself precisely. I thought your position was that the gas is less of a risk because he's sitting up and that prevents his suffocation. It's less. It's less. It's a whole gamut of the problems. And again, the claim, and this is really important, our obligation is to show a substantial reduction in the risk. And just sitting upright isn't enough to get us there. And we said, let's find something that's really substantial, really different, and really going to make a big difference to someone with this rare and unique procedure. It's authorized by Missouri law. And the fact that Missouri has yet to adopt protocols that can't condemn, protocols for lethal gas, that can't condemn Mr. Buckley, who has a fairly rare and unique condition, to an excruciating execution. Your Honors, if there are no further questions, I do have reserved the remainder of my time for rebuttal. But if there are further questions, I'm happy to take them now. Very well. You may reserve the time. Oh, I'm sorry. It's got to be available in the sense it's got to be readily implementable. And, of course, you're weighing these relative risks. So if you've got an array of speculative risks, you can't just grab something that the state could not possibly administer for years. Two things. That's your objective, but that's not the Bay's Glossop law. Our primary objective is to avoid a miserable execution for Mr. Buckley. Our next objective is to make sure that he has one that is minimally excruciating for him. Now, as for feasibility, it's worth pointing out, and the district court noted this, that the state did not dispute the feasibility of lethal gas below. It didn't even dispute it. So I think that's waived. They come up on appeal, and they start making arguments about their gas chamber is in a museum. But, you know, again, it's a fair ---- They didn't dispute ready implementation? They did not dispute that part. They did dispute, of course, that it would make a difference, but they didn't dispute ---- Did you have any evidence on ready implementation? Well, we don't think it's a complicated thing in terms of the materials you'd need and the protocols you'd need. So we think they could readily develop a protocol. Well, Oklahoma and Louisiana are far down the path of doing so. So that's what we think, what we have in the record, Your Honor. Again, as you said, your primary goal, you have several goals, obviously, to avoid the death penalty at all. But our primary goal is to what? To eliminate the substantial risk of extreme pain? Yes. Is that paraphrasing it roughly? Yes, that's right. Okay. Thank you very much. Thank you. We'll hear from the State. Mr. Let me get my notes out. You'll have to state your name. May it please the Court, my name is Joshua Devine. I'm Deputy Solicitor General for the State of Missouri. This Court can affirm on any or all of five alternative grounds, two of which concern the merits and three of which are procedural. I'll begin first with the merits, although I do intend to address each of those issues. So begin with . . . I'm glad you're starting with the merits. And my preliminary question shows my ignorance of the record. Where can I go to find a statement by the State of Missouri on behalf of these defendants on behalf of the State that will tell me the adjustments to this protocol that the State will make in executing Buckley on account of his unusual medical conditions? Well, Judge Loken, I don't think it's adjustments to the protocol because the protocol does not require, for example, for him to lie supine. Can you answer the question? I'm . . . I know your position, the protocol is just a rule of blah, blah, blah. Yes, in the record . . . You advertise the protocol as this is it, this is what you get, this is all we have to defend. Your Honor, Dave Dormier in his deposition, he repeatedly states that the gurney is adjustable. He repeatedly states that the anesthesiologist has the power . . . That's what we can do. I asked you where in the record can I go to find a commitment as to what you will do because of the concessions you made in the prior Buckley case that prompted us to conclude that the State recognized this was a condition that required some attention and has applied execution. Okay, now we're back on remand. We told you to go get this laid out and negotiate or whatever it takes. So, I would expect the record on remand to show, first of all, what's the State going to do? I read your brief and I don't get a clue. I think Dave Dormier does say that the State will make sure that he's not lying supine. I think the record does state that. We're not procedural. I want to know what you're going to do. We know you're not going to do the methylene stuff and the two things that were conceded before the en banc remand. So, what the State's going to do is they're going to follow that two-page open protocol. So, the protocol requires them to insert an IV into a vein. That's what they're going to do. And then after that, they're going to inject. Is he going to be supine sitting or inclined? He will not be supine. Where is that in the record? I don't think Dormier says that. If it's not in the record, why not? Yeah, that's the good question. Your Honor, I do think Dave Dormier's deposition states that. But if it's not in the record, I'm not sure why. You're asking what we can do? You're asking what will you do? Because this is what Ohio committed to do. And its gloss it makes it clear there was all kinds of detailed facts about what was going to happen. Dave Dormier specifically said if the anesthesiologist believes that it is in his medical interest to not lie supine, then the anesthesiologist will make sure that he is not lying supine. He says the anesthesiologist would have the freedom to do that. But he never says we've studied the situation. We understand the problem. We're going to change the typical procedure and have him seated. I don't think he ever says that, does he? There's no record that that's what the state's going to do. Judge Collinson, I can only state what I've already stated. That's my record citation. Well, what you stated was not accurate. He didn't say the anesthesiologist would do something. He says the anesthesiologist were free to do that if he were to make a first-order decision. That's a long way from saying we've studied the situation. We've decided to do X. Then I don't have a record cite for the courts. I will say, though, that the burden, of course, is on the plaintiff to prove that he must lie supine and that he must do so sure or very likely. Well, no, the burden's on him. He's shown that that's how you've always done it. That's the ordinary practice. He's shown that that has occurred in the past. Why doesn't that support an inference that that's how you're going to do it unless you put on some evidence that we're going to do it a different way? That supports an inference that he might lie supine. But, again, this is an incredibly demanding standard. He must establish that he's sure or very likely. There hasn't been a federal appellate court that's addressed one of these on the merits in an as-applied case. This is all new world. All you do is take pleading quotes from cases that were either pleading cases or preliminary injunction or stay-of-execution cases and assume that that's all I have to do to address one on the merits when there's been enough to require a fact-intensive resolution on the merits. That's correct, Your Honor. This is at a different stage of litigation than previous situations have been. Well, don't worry. We'll do it right. I can state... It's the same thing you say in the facial challenges. I can state affirmatively that the State will not make him lie supine. Now, I'm sorry that the record citation is not pleasing the Court on that issue. I can move to the other issues, though. What do you mean? You're going to now stipulate that he'll be seated in or he'll be in a different position than supine? Yes. Again, supine is a liar. Do you have authority to do that on behalf of the Director? I think the record fairly states that. No, I'm not asking. Okay. Well, that's a different... All right. You think the record says that the State will position him in a way other than supine? I do think the record states that, Your Honor. You think that's in Dormeyer's testimony? I do. Now, in any event, there are many other reasons. I just don't understand why the State maybe could address... You want this Court to say, assuming he'll suffocate for four minutes, we should allow the execution to proceed. No, Your Honor. I assume you're saying you don't think that's really what's going to happen. That's not what's going to happen, Your Honor. But you didn't ask for factual findings on that. You wanted to go on summary judgment and have us say, even assuming he's going to suffocate for four minutes, the execution should proceed. Why is that the State's litigating? Your Honor, because I'm... Perhaps you wouldn't just ask the District Court to make findings if you're so sure that there will be no suffering. Your Honor, this whole line of argument about the four minutes, the 52 seconds, I do want to stress that's a red herring. That's not what is at issue. We're not stating that even assuming this 52 seconds or four minutes issue. We're not stating that. Your position was, even assuming the District Court's right, there's a factual dispute on Step 1, he loses because he hasn't shown an alternative. And therefore, we should assume that she's right, there might be the four-minute thing if that's the finding. No, Your Honor. Our position is that he's failed to submit evidence on either of those prongs. You say she was wrong on Prong 1. Correct. To say that there's a factual dispute. Correct. And here's the critical inquiry. So this 52 seconds, this 240 seconds, this is all a red herring, and here's why. When Dr. Zivit testifies about this 52 seconds line of questioning, he states that 52 seconds or 240 seconds or whatever have you is the time when he will cease producing detectable brainwaves. However, on pages 81 to 86, he says that this twilight stage, if it occurs, is going to occur before that time, before the 52 seconds, before the 240 seconds. We repeatedly asked him, well, when is this going to occur? And he said he could not say. In fact, he said, quote, unquote, at some point. We asked him how long this twilight stage would occur if it did occur, and he said he couldn't say. He said that there was a wide range of time where it could be. So this whole EEG situation about the 52 seconds, 240 seconds, that's not relevant to how long this twilight stage, if it occurs, will actually occur. And that's important because, for example, if the twilight stage occurs for, you know, just half a second or two or three seconds, there's nothing objectively intolerable about requiring somebody to hold their breath essentially for that short period of time. So we assuredly do not concede that there's this issue of, you know, several minutes occurring where this twilight stage might occur. No, we don't think the record states that at all. You say there's no issue of fact as to whether he'll suffer pain. Correct. He's very likely to suffer pain. Correct. They never submitted any evidence about the length of that twilight stage. They submitted only evidence about the length of the EEG stage, which are two entirely different things. What page were you citing there that you wanted us to look at? Pages 81 to 86 of our appendix. Now, as to this cut-down vein issue, I can briefly address that with three real quick points. One, the district court stated on page 7 that this was not preserved, page 7 of the addendum, that is. The district court said that Bucklew never presented any legal arguments about his veins whatsoever. And so I don't think Bucklew can do so for the first time on appeal before this court. In addition, he hasn't presented evidence that… There was certainly hemorrhaging and suffocation in the case. It was in the case at the in-bank stage. Yes, Your Honor. It was in our in-bank majority opinion. Yes, Your Honor. The hemorrhaging, he asserts. In fact, he asserts that that will occur in any execution. He asserts that on pages 136 and 128 of his appendix. So that applies not only to the injection but also to the lethal gas. Now, as to the cut-down procedure, again, he's not even submitted evidence that they can't use peripheral veins. To be sure, he submitted evidence that they can't use peripheral veins in his arms. But Dr. Zivit, nobody has observed his legs to see whether the peripheral veins in his legs can be used. But even assuming that a central vein had to be used, Dr. Zivit testified that even when he was a relatively inexperienced anesthesiologist, he had a 90% success rate on any given attempt. This isn't a situation where he is sure or very likely to experience a cut-down procedure. So the second reason this court can affirm is, again, because of what the judges were stating earlier. There's no time element whatsoever as to how quickly or slowly lethal gas will occur. There's simply no evidence whatsoever. In fact, Dr. Zivit conceded on page 39 of the appendix that he could not know. There was no way of knowing. But I thought Dr. Antognini said it would work very quickly, and he equated pentobarbital and lethal gas, so they would both work very quickly. No, Your Honor, he didn't quite equate them. He did say both worked quickly. But quickly, again, is somewhat of a vague term. Yeah, it's vague, but you don't think he at one point in the record would support a finding that he equated the two and said they were about the same? Your Honor, even if that's true, Dr. Zivit and Bucklew are stating that it would take a lot longer for pentobarbital. Yeah, that's why they say there's a factual dispute, because you've got Antognini saying they're both quick, and you've got Zivit saying pentobarbital takes longer, but you don't have Zivit saying gas takes longer, so you have the factual dispute. No, Judge Colleton, if what you're saying is true, that Dr. Antognini says they'll happen at the same time, but if what Bucklew says is true, that pentobarbital will last a long time, then it also follows that lethal gas will last a long time. Oh, I see what you're saying. Well, I don't know if you can cause Antognini's opinion to change on gas by disputing his opinion on pentobarbital. I don't think it would change. I think his opinion was that they were both somewhat similar. But, again, your line of questioning relies on his assertion that the 52 seconds, 240 seconds is actually relevant when I'm saying it's not relevant, because that has nothing to do with how long the twilight stage, if it occurs, will last or won't last. So those are the first two reasons I think this court can affirm. Now, I also think... What about the pre-injection stage? You might have heard so much about this morning that I thought the focus was going to be on the timing after injection. Again, the pre-injection stage, there's simply no evidence to suggest that he will sure or very likely experience a cut-down procedure. Again, Dr. Zivitz never even looked at his legs. We have no evidence in the record whatsoever about the state of his peripheral veins in his legs. Forget the cut-down, just the argument this morning about all the stress and what stress does to this fellow. Yes, Your Honor, that... Now we're going to have to go in, whatever vein we go in, it's going to be hunting around and so forth. I don't think it's going to be hunting around, Your Honor. Again, Dr. Zivitz... What's the record from your perspective on the likelihood of venous access of any kind? The likelihood is... Triggering Mr. Bucklew's tumor problems. Well, I should point out that he, again, he states in his complaint that the stress of any execution will lead to this type of hemorrhaging situation. But specifically, there's no quantifiable degree of how much hemorrhaging he will have if he's pricked with a needle. But I will state that Dr. Zivitz said, even when he was a relatively inexperienced anesthesiologist, he had a 90% success rate on the first attempt. I understand that, but he wasn't working on patients with Bucklew's conditions. No, but Bucklew's condition has nothing to do with the adequacy of his veins. By his MRI experience and all the other anesthesia he's encountered, as establishing a record that the only stress we're talking about here is the stress of execution. Your Honor has said it better than I could. I think that's right. He has, on eight different times, he has undergone some kind of IV and undergone some kind of anesthesia. Now, I would ask this Court to consider also adjudicating this case on alternative procedural grounds for a number of reasons. First, it shows that these rules are real and that they will be enforced, even in cases where somebody brings a little bit of an unusual claim. But more importantly, this Court stated in the Bucklew 2015 en banc opinion that this case has dragged on for quite some time and that expediency is an extremely important value in this case. And the procedural issues that we have raised create finality in a way that the merits arguments alone do not. And what I mean by that is every state that performs lethal injection has had to alter their protocol as different chemicals become available or don't become available. That's something that, again, every state runs the risk of and could happen in the future. So, for example, if this Court adjudicated the statute of limitations argument, what it would be stating is that his claim that any lethal injection by any chemical whatsoever, that arose at least in early 2008, if not sooner. So that would adjudicate far more than just this merits claim. It would also adjudicate every potential claim concerning lethal injection with whatever chemical he brought whatsoever in the future. So there would be substantially more finality value if this Court also adjudicated the procedural claims, specifically the statute of limitations and the res judicata arguments. Now, as to the res judicata claim, they contend that a res judicata claim is based solely on our statute of limitations argument. That's not true because of a critical admission that they make on page 4 of their reply brief. So, simply put, res judicata means that if he could have litigated this issue in a separate action but did not do so, and that separate action subsequently becomes final, then that separate action bars his complaint. Here he's asserted that... But it could have been brought in claims-splitting issue with respect to the as-applied challenge. To the extent that they are trying to sneak another facial challenge in here along with just dressed up as supposedly as-applied, then it seems to me you've got to direct... I think both, Your Honor. I think that they have... Not both, but I think in this evolving jurisprudence regarding these lethal injection challenges, it's pretty hard. The authorities tend to suggest that as-applied challenges are not foreclosed because you joined in a mass facial challenge that was unsuccessful. Let me explain specifically. Because of the critical admission that they make on page 4 of their reply brief. So there he states that his cause of action accrued in April 2014. Now, we think it was much before that, but even taken on its own terms, it's still barred by res judicata. Because the Zink litigation was still ongoing. Zink did not become final until May 2014. So he had an opportunity to join that claim to the Zink litigation. Wasn't it too late to add a new claim at that time? No, absolutely not. In fact, on May 2nd, the Zink District Court ordered him to replete and ordered him to replete on May 9th. Now, he filed this claim on May 9th, on the dates where he was supposed to replete in Zink. He ordered them to replete to allege a feasible alternative. Correct, Your Honor. He didn't reopen the pleading deadlines, did she, for any and all amendments? She didn't foreclose that. And if he's right that this arose in 2014, then he should have asked the court. He should have submitted a motion to the court saying, I have a new as-applied challenge. That's what ordinary principles of res judicata require. So on that very day when it was due, on the very day when— He would have said, no, it's too late to amend. Then the exception under restatement of judgments, Section 26, would apply because the district court would have given him permission to split his actions. But because he never asked the district court for that permission— What if the pleading—what if there was a scheduling order that said you can't amend after such and such a date? Does that trigger the restatement exception that you just mentioned? Because the district court has, by that standing order, prohibited the claim? No, they would have needed to motion for a variance from that scheduling order. What's the authority that the plaintiff's required to file a motion for leave to amend outside of the previously established deadlines? Judge Collett, it's nothing that specific, but this court's opinion in Bucklew in footnote one, as well as the Supreme Court's opinion in Allen v. McCurry, that's 494 U.S. at 94, states that when these issues are pending at the same time, when one becomes final, res judicata applies if they did not attempt to try to get this other issue into that litigation. So if he had attempted to and failed to do so because the district court thought it was more appropriate for those to be litigated separately, res judicata wouldn't apply on his grounds. But because he didn't attempt to do so, and again, he has the same counsel in both cases, the zinc litigation, they asked him to replead on May 9th, and he issued this separate pleading on May 9th. There's really no excuse for not asking the district court to put this in the zinc litigation. What did you say? Other than footnote one in Bucklew, what's the other authority you suggest? Allen v. McCurry, it says. Oh, Allen v. McCurry. Okay. Yeah. All right. Now, I think we also have a separate statute of limitations argument. Now, he's essentially arguing that he had no opportunity to file a complaint in 2008 when he petitioned this court. That's not true. In fact, what he did in 2008 is exactly the same thing he did in 2014. Let me explain. In 2008, he retained Adam Cohen, a doctor and a medical expert, to review his medical records. Dr. Cohen did so, and then Dr. Cohen opined that based on his review of those records, he had a circulation-based theory that would render lethal injection unconstitutional. Now, in 2014, he does the exact same thing. He retains Dr. Zivit and Dr. Yamraz, both of whom review his medical records. They don't conduct any kind of comprehensive medical exam. Instead, they both affirmably state that they want to conduct that exam, but they don't conduct it. So they do the same thing. They review his medical records. Both opine that he has a circulation-based theory or a circulation-based claim that would render lethal injection unconstitutional. So if retaining expert counsel to review your medical records was enough in 2014, then there's no reason it shouldn't have been enough in 2008. He did the same thing. Now, to the extent his argument- But are you talking now just about the circulation-based claim? Well, I think that's the only claim that's valid. I think that's the only claim that's put in his complaint, and here's why. Well, this isn't pleading. Yeah, that's your- Your brief on we've got to treat this like a pleading case is just wrong. No, Your Honor, we- This is what lawyers who don't want to try cases do all the time. Your Honor, we cited several different cases where this court has said that you can't- But they are- They're not outliers, but they're not the normal practice, which is when discovery leads to new evidence and new theories of claims that were basically pleaded, the court moves on, sometimes with an amendment, often not. That's correct, Your Honor. I don't think this is a claim that was actually pleaded, and here's why. He had to draw a link from his medical- It was stated in the Bucklew- the quotations in the Bucklew opinion. This twilight stage was not. The circulation-based thing was, but he had to draw- The suffering and hemorrhaging and- Yes. The twilight stage stuff just elaborates on that. I don't think so, Your Honor. The suffering and hemorrhaging, that is in the complaint. I understand your position. Yeah. So the suffering and hemorrhaging is in the complaint. The twilight stage, which I think is structural, not just the details. That's never in the complaint. The only thing he identifies, and this is on page- The only thing he identifies on page 98 of his appendix is that lethal gas will, quote, bypass Mr. Bucklew's circulatory system. It's the only thing he ever identified. On page 28 of the appendix, it's the only thing the district court does. I find where the Eighth Circuit has ruled that even if something was arguably not within the scope of the pleading, if the district court went on and considered on the merits, that's the case we review. I can't give you a specific number of cases. I can only repeat the cases that I cited. That to me is the general rule. I haven't researched it. Again, I would just point to the cases we cited in our brief that state that you cannot defeat summary judgment just by bringing a new claim that was not fairly in the complaint. Wouldn't it be more than passing strange after the en banc court sent this back on the issues we sent it back on, we'd say, oh, sorry, we shouldn't have done it. There are procedural bars that eliminate any of these claims. No, I don't think so, Your Honor. Of course you don't think so, but why do you dodge the merits so much? I'm not trying to dodge the merits. To me, the procedural arguments are sort of a confession of error on your part that you're weak on the merits. No, Judge- Very weak on the merits. No, Judge Wolman, I think we're very strong on the merits. I've already- I think you're getting some advice on litigation strategy. Well, advice is always appreciated. My reason for pressing the procedural arguments isn't because I think we're weak on those arguments. You have to protect your records, sure, because you may raise them on the Supreme Court. Who knows? And the Supreme Court will buy it. And also because of the tremendous finality concerns that are supported by the statute of limitations. Well, I was hoping in a way, in a sense of the word, that the State's entitled to have its statutes enforced, the defendant's entitled to have the court rule on the issue, district court rule on the issues that we sent it back on. This Court explicitly reserved those questions in- The lawsuit came, what, three months after our in-bank remand? Yes, Your Honor. And pages and pages of detailed factual analysis by the majority, written by Justice Alito, who in base has said, we don't want the courts to have to micromanage all this stuff, but he nonetheless goes into clear air review on a preliminary injunction denial for pages, and the dissent says, yeah, that was the right thing to do, and then, of course, they disagree on the specific analysis. And so how could you think that the proper way to approach this was in this facial pleading type stage? I think what you're asking us to do would get almost summary reversal by the Supreme Court. No, Your Honor, the difference between this and what occurred in Glossop is, in Glossop, we were at the next stage of the litigation. What opposing counsel said he would do next, which is assert abuse of discretion and assert clear air based on factual findings. Our position isn't that there are factual findings to be made. It's that they haven't produced the evidence at all necessary to satisfy each of the predicates that they need to. I think it was tactically very dubious. If there are- You had the option of saying, we think we could get summary judgment, but we're so confident in our factual submission that we just want the judge to make findings. And then we'll go up on a clear air standard of review, like in Glossop, and you'll have a finding that the man is not going to suffer. But you opted instead to say, no, we're going to go on summary judgment or this pleading argument. The point of summary judgment generally is to avoid the litigation delay that occurs with trial. That's the entire reason summary judgment exists. It's a strategic decision, I agree. But you have a bench trial situation here, not a jury trial. A judge who's responsive. I don't know if it would have taken years to get a- That may or may not be true, Your Honor. In hindsight, it's always 2020, of course. I will say, Judge Loken, I think you're correct. This is a legal issue, not a factual issue. This court doesn't seem to have held it expressly, but the Fourth Circuit has in Emmett v. Johnson's. The Fourth Circuit has held that. If there are no further questions, we respectfully ask that this court affirm on any and all of the alternative grounds we have requested. What was that last point? What did the Fourth Circuit say in Emmett v. Johnson? The Fourth Circuit said that these questions about whether something is substantial, objectively intolerable, all those questions are legal questions. So a fact finder could determine, for example, whether they thought Dr. Zivit was credible. But they couldn't determine whether this is subjectively or substantially or objectively intolerable. That is a legal question. So we request that the court affirm. Thank you. Very well. Thank you for your argument. We'll hear from counsel on rebuttal. Thank you, Your Honors. May it please the Court. Early in the argument, there was a question about why there's no evidence in the record about what they will do in the execution chamber. And there's a simple answer to that. Dr. Dormier can't testify about what we'll do. It's not his call. He doesn't get to decide. And Presythe is in charge. I strongly disagree with that. The courts are looking at this from what you can set up in the way of procedure and in advance of something, a process that is to some extent unknown and as to which isolated mishaps are legally irrelevant. So it is certainly possible for the state to identify and the plaintiff's counsel to take shots at how we're going to do it. I agree entirely. But it has to be the person who's going to make the decision. It has to be the person with the authority. Absolutely not. The doctor doesn't write this. Anne Presythe is in charge of this execution. Why can't she testify? Because she did. We asked her. We said, okay, is this going to happen? She says, I don't know. It's going to be up to the medical people. Well, that's what she said, but she doesn't have to do it that way. She could say, I'm the director of the department. I've studied this. I've met with the people. Here's how we're going to do it. He's going to be seated. He's not going to be supine. Here's how we're going to put the injection in and so forth. Why do you have to have M2 and M3? Why can't Presythe say that? A, that wouldn't be Dormeyer. That would be Presythe because she's in charge. Fine. Now, we asked the right person in front of us. And what we got was it's somebody else's call. Now, you might be right that Anne Presythe could come in and testify and say, I'm going to demand that they do A, B, and C. And then this court could treat A, B, and C as something that's going to happen. But what we have now isn't that. That's not what we have. And we tried to get it. We tried to get it. And then when we couldn't get it from her, we tried to get it from the people she said are going to be making the call. Did you find the order I asked about whether precluding you from or striking? They're looking. They're looking. And I will try and get that before I walk away from the podium. The second thing I wanted to emphasize. I think they're waving it at you right now. You got it? Oh, the court. Yes. So the court's ruling on the order. This is page 5 of the April 11, 2017, order on the motion to compel. And it says it's at the top before the privilege log. At the end of page 23. Before the privilege log. Right. So the court's ruling says there is no claim remaining that requires consideration of the execution team's qualifications and training. This is the mistake that the district judge made. That this only went to that claim to count to. Yeah. So the court concludes. I'm sorry. Apologies. So the court concludes that the scope order sets proper limits on discovery. Plaintiff's request for additional details about the execution team's members and access to their depositions from other cases is denied. In other words, there had been testimony by M2 and M3 . . . Okay. That was not . . . If that's the best you've got, it doesn't solve my problem. Well, it's what we have. That's just saying if we can't . . . That you didn't get your deposition discovery, which is an issue . . . Well, we also . . . That's what I was asking. We also didn't get the information that was present in the other case. Remember, there's this peculiar circumstance in this case where a prior counsel, who's still on the case, of course, Ms. Pallotti, has actually seen certain deposition testimony, certain evidence about M2 and M3 that we haven't. And that she has been barred . . . The district court counsel is absolutely right in terms of this court's review of that issue. But what we have been barred . . . You asked what we were barred from doing. We were barred from inquiring into or presenting any evidence that would be of the same nature. And so, that's it. That's what that ruling says. And that's what we're talking about. You read, but okay. But that . . . Study it further. So then, the second . . . There was an issue brought up about surgeries, about his prior ability to . . . Mr. Buckley's prior ability to go through surgeries. Of course, in a surgery, they're trying to keep the patient alive. There's an anesthesiologist sitting there, observing and making sure the airway is clear. In the execution chamber, the anesthesiologist inserts the drug and leaves the room. Nobody's watching out for his airway in the execution chamber. That's a huge difference. And that's part of the problem with saying, well, he's been able to lie flat before. The circumstances in the execution chamber are completely different from what he's faced before. And the risk of suffering here is so substantial . . . It's a 20 or 30 second difference. It's not huge. Well, that goes . . . Of course, there's the factual . . . I concede. There's a factual dispute about how long he'll be able to experience that sense of suffocation after the drug is introduced. And after he enters into the unconscious state. For what it's worth, counsel, I think, is just not right about what pages 81 through 86 of Dr. Zivit's testimony. I commend it to you. You'll see it's confused because, quite frankly, the questions put to Dr. Zivit were confused. The questions were not precise. And Dr. Zivit is clear that they're using terms that don't have any meaning. That their understanding about the way brain death works is wrong. That what happens when an EGEG stops revealing information doesn't tell you about full ability to experience a sense of suffocation. Does this go to the 52 to 240 seconds argument . . . Yes. . . . that Mr. Devine says is a red herring? That's right. And your argument is that the evidence is clear enough that it should not be discarded off hand? Absolutely. Absolutely. And, in fact, the district court didn't. I mean, that's the other important fact here. The district court assumed it's true. Assumed. Is that part of your argument that she made contradictory findings or did that relate to a different part of it? Well, when she turned to the comparison is when she made a contradictory finding. And that's our fundamental position is that when she turned to . . . Well, back again to Mr. Devine's argument. He said there's no evidence that the cut-down procedure will be used. Even assuming that it will be used, it's not likely to result in extreme pain or pain or what? Well . . . To what extent is this cut-down . . . I don't want to disparage it by saying this cut-down. To what extent is the cut-down procedure of critical importance in this case? Assuming that it has to be used. I think it's a substantial additional factor in the degree of suffering that Mr. Buckley was going to face. The suffering from the procedure itself? I mean, the cut-down or is it the result? The cut-down is part of it because they're carving straight into his leg. I mean, they're just . . . they're carving right into his leg. That's what's going on in a cut-down procedure. Won't he be anesthetized? No, because he doesn't have venous access. The whole point is to gain venous access. There's no indication he's going to be anesthetized. Is the cut-down thing the same in the artery, the leg, the same that they do when they gave me an angiogram? I don't know. There they gave me an anesthetic. Yeah, but could you have an . . . I don't mean to trivialize it. No, understood, understood. But what I want to emphasize is that this is carving into his leg without anesthesia. And what we don't know . . . what we know is that if you use lethal gas, there's no chance of this. So that's . . . it's not a nothing, Your Honor, and it's not a detail. It's a significant factor. And at the end of the day . . . What about he said that she has a footnote in the district court that you waived this argument? Yeah, that's just not true. Again, if you look at the appendix 1044 and the whole area . . . So we opposed their . . . we submitted a statement of . . . in opposition to their statement of undisputed facts. And then we appended additional facts which we thought were undisputed. Now, you read that document. It's clear. All of this is there. We put it in front of her. And she just didn't reach it. And that's not a reason to deprive Mr. Bucklew of the full scope of his claim. Again, getting back to the details, apart from the 52 to 240 seconds where . . . And part of that argument is what? During that time, he's going to be gasping to try to remain alive or gasping . . . The human body's reaction is to stay alive. I don't know physically what it's going to look like from the outside. What's important is what it's going to be experienced subjectively as from the inside. And that, Dr. Zivit, is clear. It's going to feel like someone's choking him slowly to death. There again, does that come down in terms of our view as judges that highly undesirable and regrettable . . . But in the scope of the execution project process, is it that type of pain that would be barred by glossop? Yes. We think that is excessive and needless pain and suffering. Several minutes of slowly choking to death, especially on your own blood, is unconstitutional. If there are no further questions, Your Honor. Very well. We thank both sides of the argument. The case is now submitted and we will take it under consideration. That completes our argument calendar for this morning. The court will be in recess subject to call.